OPINION OF THE COURT
David S. Ritter, J.
The defense has proffered testimony by Dr. Robert Buckhout, who is said to be an expert on the scientific and psychological aspects of eyewitness identification. Defendant contends that he “has an absolute right to present expert testimony regarding the results of scientific studies concerning the impact of specific variables which affect the accuracy of memory, perception and eyewitness identification.” Accordingly, defendant seeks authorization pursuant to article 18-B of the County Law to retain the services of Dr. Buckhout.
In support of his application, Mr. Brown’s attorneys have submitted an unsworn statement from Dr. Buckhout, dated May 25, 1984, describing his qualifications and the tenor of his proffered testimony. Dr. Buckhout states, inter alia:
“In general outline, my testimony covers the scientific contributions of psychologists to the understanding of human visual perception and memory with a special emphasis on the situation faced by the eyewitness to a crime. The main points covered in my testimony consider elements of the crime situation and look to the published scientific literature for answers to questions about how reliable a witness can be expected to be under the circumstances. The basic question stems from what we believe a perfect witness could do. The factors we do research are those which *939 can lead a crime witness to deviate from what might be expected of a perfect witness. Each of the factors cited are backed by specific research by experimental psychologists, dating back to as far as 1895, and a subject of continued research today. Published research on visual perception and memory, from which I draw these findings, and, upon which I base my opinions, amount to about 450 scientific articles per year, including some articles published by me.
“A key question remains. What contributions can a scientific study of perception and memory add to the common experience of the average person or juror who witnesses all the time and could apply common-sense analysis to the evaluation of eyewitness testimony? My answer is that the scientific knowledge comes from controlled experiments in which hundreds of witnesses are exposed to crimes whose details are a matter of record. We can uniquely determine how accurate and how reliable each witness is in the research program by comparing his or her testimony with the true facts. Our findings can be of invaluable assistance to the trier of fact as we discuss human limitations and abilities to see and remember events. Some of our findings agree with the common experience of the layman while some do not.”
The day after defendant communicated his intention to call Dr. Buckhout as a defense witness, the District Attorney moved to preclude any proffered testimony on the subject of eyewitness identification. The prosecution advances three contentions in support of preclusion: (1) The conclusions respecting eyewitnesses which Dr. Buckhout has offered in the past, and presumably will repeat herein, are not generally accepted in the scientific community; (2) the courts have almost uniformly held that the shortcomings of eyewitness testimony are not beyond the ken of the typical juror; and (3) in any event, such expert testimony suffers the untoward tendency to confuse and mislead juries, effectively subverting the fact-finding process by turning the trial into a battle of the experts in which their credentials and credibility become the focus rather than the testimony of the eyewitnesses.
As a general rule, the admissibility of expert testimony on a particular issue is addressed to the discretion of the *940 trial court. (Selkowitz v County of Nassau, 45 NY2d 97.) The guiding principle is that expert opinion is proper when it would help to clarify an issue calling for professional or technical knowledge possessed by the expert and beyond the ken of the typical juror. (De Long v County of Erie, 60 NY2d 296, 307, citing People v Allweiss, 48 NY2d 40; Selkowitz v County of Nassau, supra; Dougherty v Milliken, 163 NY 527.) Thus, the trial court is responsible for determining “when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness.” (People v Cronin, 60 NY2d 430, 433.)
Our adversary system of justice has historically relied on cross-examination as a mechanism to alert the jury to any inaccuracies or inconsistencies in the testimony of an eyewitness (see United States v Amaral, 488 F2d 1148). Indeed, defense counsel has already cross-examined each of the five prosecution eyewitnesses at length regarding his or her opportunity to observe the incident and the defendant. Several of the eyewitnesses were confronted with inconsistencies. I am confident that the jury will be able to assess the credibility and reliability of each of the eyewitnesses who testified after receiving proper instructions on the subject of eyewitness testimony (People v Valentine, 53 AD2d 832).
Thus, I conclude that expert testimony will not assist the jury in their evaluation of the testimony by the eyewitnesses in this case and I hold that Dr. Buckhout’s testimony is inadmissible at trial as it would “infringe upon a properly instructed jury’s power to determine the reliability of the People’s evidence” (People v Valentine, 53 AD2d 832, supra; see, also, People v Brown, 117 Misc 2d 587).*
My ruling regarding Dr. Buckhout is limited to the issues presented by the evidence in this trial. I do not *941 believe that it is necessary to consider whether expert testimony would ever be admissible on the subject of eyewitness testimony. Nor is it necessary to address the prosecution’s contention that the prejudicial impact of this type of expert testimony would outweigh its probative value. Simply stated, Dr. Buckhout’s proffered testimony is not admissible with respect to the issues in this case. Accordingly, defendant’s application to retain his services at public expense is denied.

 Although numerous trial courts of various jurisdictions have allowed Dr. Buckhout and other “experts” to testify along the lines of the proffered testimony herein, my research indicates that every appellate decision on point, except one, affirmed trial court rulings to exclude the expert testimony (Sobel, Eye-Witness Identification, Legal and Practical Problems [2d ed], 8 9.6 [b], and cases collected in n 124). The one case resulting in reversal was the Arizona Supreme Court’s decision in State v Chapple (135 Ariz 281). The decision in Chappie was based on a unique set of facts not present in any of the other reported cases and clearly distinguishable from the facts presented in this case.